UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

CIVIL ACTION

IN RE:

AAMAGIN PROPERTY GROUP, LLC

NO. 23-383-JWD-RLB

<u>**ORDER AND REASONS**</u>

Debtor and Appellant Aamagin Property Group, LLC, ("APG") appeals the bankruptcy court's May 3, 2023, dismissal of APG's petition. APG raises three issues on appeal. All center on the authority of its majority member, a company owned by former-APG President Willard J. Belton ("Belton"), to unilaterally file the bankruptcy petition on APG's behalf against the wishes of its current President, Appellee Ralph Brockman ("Brockman"), and APG's minority member, a company owned in part by Brockman. For the reasons stated below, this Court finds no error in the bankruptcy court's conclusion that unanimous consent of APG's members was required to file the petition and therefore AFFIRMS.

**I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

**A.  The History of APG and its Corporate Documents**

On September 30, 2003, APG was organized with two members: (1) WJ Belton Company, L.L.C., holding a 51% ownership interest, and (2) Sunquest Properties, Inc., holding a 49% interest. (Record of the Bankruptcy Court, Doc. 2-1 ("R.") at 75.) Belton was named the manager. (*Id.*)

On November 1, 2006, the Articles of Organization were amended for the time. (R.076.) These amendments provided (1) that Belton continued as manager but with the designation "President of the Company;" (2) that, under Section 3.1.2, "The President shall have full,

exclusive, and complete discretion, power, and authority . . . to manage control, administer, and operate the business and affairs or the Company for the purposes herein stated, and to make all decisions affecting such business and affairs[;]" and (3) that, under Section 3.1.4, (a) the President could be removed by vote of the members holding at least thirty three percent (33%) of the percentages held by Members, and (b) in the event that the manager was removed, then Sunquest had the sole right to appoint a new President, who could then only be removed by unanimous consent of the members. (R.076–77.)

On October 28, 2011, APG made a Second Amendment to its Articles of Organization. (R.082.) Article 3.1.4 was again amended to provide: "Removal of Manager/President. The Members, by vote of Members holding a majority of the Percentages then held by Members, at any time and from time to time and for any reason, may remove the Manager then acting and elect a new manager or managers." (*Id.*)

A dispute arose over who was in charge of APG, so Metro City Redevelopment Coalition, Inc., filed a writ of *quo warranto* that was tried on April 29, 2013, in the 19th Judicial District Court. (R.126.) The trial court entered a judgment on June 10, 2013, declaring: (1) that the 2006 First Amendment to the Articles of Organization was controlling; (2) that, under that amendment, Sunquest had the right to remove Will Belton as President of APG and appoint a replacement of its choosing; (3) that the Second Amendment dated October 28, 2011, was "invalid as *ultra vires*;" and (4) that, on October 31, 2011, Sunquest properly exercised its rights under the First Amendment to remove Belton as President and appoint Brockman in the position. (R.126–27.) Judgment was entered recognizing Brockman as President. (R.127.) The Louisiana First Circuit Court of Appeal found no error in this decision and affirmed. (R.174–84.)

### B. Proceedings before the Bankruptcy Court

#### *1. The Petition and Motion to Dismiss*

On March 6, 2023, APG filed a voluntary petition for Chapter 7 bankruptcy. (R.001–02.) The petition was signed by Belton, who represented himself as "CEO and Member of 51% Majority Membership." (R.005.)

On March 27, 2023, Brockman filed a motion to dismiss. (R.039.) Brockman argued that he was authorized as President of APG and that he at no time consented or authorized Belton or WJ Belton Company to place APG in bankruptcy. (R.040.)

APG opposed the motion. (R.136.) In sum, APG argued that WJ Belton Company had standing to file the bankruptcy petition as a 51% majority member/owner of APG. (*Id.*) APG cited Sections 5.2, 5.2.3, and 5.2.4 of the Operating Agreement:

> 5.2. *Meetings of and Voting by Members.*
>
> 5.2.1. A meeting of the Members may be called at any time by the Manager or by those Members holding at least a majority of the Percentages then held by Members. Meetings of Members shall be held at the Company's principal place of business or at any other place in Baton Rouge, Louisiana, designated by the Person calling the meeting. Not less than ten (10) nor more than ninety (90) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than a majority of the Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

> 5.2.2. Except as otherwise provided in this Agreement, the affirmative vote of Members holding at least a majority of the Percentages then held by Members shall be required to approve any matter coming before the Members.
>
> 5.2.3. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding a majority of the Percentages then held by Members.
>
> 5.2.4. Except as otherwise provided in this Agreement, wherever the LLC Law requires unanimous consent to approve or take any action, that consent shall mean, in all cases, rather than the consent of all Members, the consent of Members holding fifty-one percent (51 %) or more of the Percentages then held by Members.

(R.160–61.)

APG also cited La. R.S. § 12:1318, governing voting rights of members, which provides:

> § 1318. Voting rights of members
>
> A. Unless otherwise provided in the articles of organization or a written operating agreement, each member of a limited liability company shall be entitled to cast a single vote on all matters properly brought before the members, and all decisions of the members shall be made by majority vote of the members.
>
> B. Unless otherwise provided in the articles of organization or a written operating agreement, a majority vote of the members shall be required to approve the following matters, whether or not management is vested in one or more managers pursuant to R.S. 12:1312:
>
>> (1) The dissolution and winding up of the limited liability company.
>>
>> (2) The sale, exchange, lease, mortgage, pledge, or other transfer of all or substantially all of the assets of the limited liability company.

La. R.S. § 12:1318.

*2. Arguments at the May 3, 2023, Hearing*

On May 3, 2023, a hearing was conducted in the bankruptcy court on Brockman's motion. (Transcript ("Tr.") at 1, Doc. 4.) Brockman and Belton testified. (*See* Tr. 8–36.)

Brockman confirmed that he was the manager and that he did not consent to the filing of the bankruptcy petition. (Tr. 9–10.) Brockman further explained that he became President in 2011 when investor partners in APG's properties brought to his attention improprieties when Belton was manager of APG, and they agreed that Belton would step aside as manager because of that. (Tr. 14–15.) But the Court emphasized that it was focused on the "very finite, limited issue . . . [of] whether [Belton] had the authority to place [APG] in a bankruptcy," and that the parties' deteriorated relationship was not at issue. (Tr. 17–18.)

Belton testified and confirmed the ownership interests of APG and that Brockman was President and manager. (Tr. 21, 32.) He urged that Brockman had no authority to act in a transaction that exceeded $3,000 without unanimous consent. (Tr. 22.) Belton relied upon Section 5.1.3, which provides that:

> 5.1.3 **Limitations on Authority of the Manager**. No act may be taken, sum expended, decision made or obligation incurred by the Company with respect to the following matters unless and until the same has been approved by a unanimous vote of the Members in accordance with their interest: . . . (ix) any expenditure, acquisition, purchase, sale, exchange financing, contract, or any other type of transaction exceeding $3,000

(Tr.28–29; R.056–57.) Belton also testified that the operating documents give him the authority over liquidation and dissolution. (Tr. 25.) Belton said he revoked his consent to anything Brockman would do as manager, so (a) the motion to dismiss should be dismissed, and (b) APG should be dissolved or liquidated. (Tr. 28–31.) He conceded on cross, however, that a state court action had been filed to dissolve the company. (Tr. 33–34.)

In argument, counsel for Brockman relied on Section 5.1.1 and 5.1.2 for the proposition that a member has no authority to represent the company:

> 5.1.1. ***Manager***. The Company shall be managed by a manager. . . .
>
> 5.1.2. ***General Powers***. The Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to: [certain enumerated powers]. . . .
>
> 5.1.3.1. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.
>
> 5.1.3.2. This Section 5.1 supersedes any authority granted to the Members pursuant to Section 1318(B) of the LLC law. Any member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expenses incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

(Tr. 38; R.056. Brockman's attorney also said that dissolution proceedings should continue in state court. (Tr. 39–40.)

Counsel for Belton, on the other hand, asserted that APG should be dissolved under La. R.S. § 12:1335, which provides, "On application by or for a member, any court of competent jurisdiction may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement." (Tr. 42–45.) Belton urged that the Articles of Organization and Operating Agreement create ambiguity on a majority owner's powers. (Tr. 43.)

6

*3. The Bankruptcy Court's Oral Reasons*

Later in the day, the bankruptcy judge granted the motion to dismiss and issued oral reasons. (Tr. 47–56.) The court first found, based on the relevant corporate documents highlighted above, that Brockman was the current President of APG and that this was undisputed. (Tr. 49–50.)

The Court then found that, while APG's corporate documents were silent on who had the authority to institute a bankruptcy proceeding, those documents require the unanimous consent of members before all of the company's assets could be transferred. (Tr. 51–54.) Specifically, Section 5.1.3 stated:

> 5.1.3 *Limitations on Authority of the Manager*. No act may be taken, sum expended, decision made or obligation incurred by the Company with respect to the following matters unless and until the same has been approved by a unanimous vote of the Members in accordance with their Interest: . . . (iii) sale, exchange, financing, refinancing or mortgaging of the assets of the Company (other than credit extended to the Company by usual creditors in the ordinary course of Company business);

(R.056–57.) The court then explained that filing a bankruptcy petition fell under this section because it involved the transfer of all of the company's assets outside the ordinary course of business. (Tr. 51–52.) For this, the bankruptcy judge specifically cited *In re Delta Starr Broad., L.L.C.*, which said:

> Under section 541 of the Bankruptcy Code, the commencement of a voluntary bankruptcy petition creates an estate, which comprises all of the debtor's interests in property as of the commencement of the case. *See* 11 U.S.C. § 541(a). The filing of a voluntary bankruptcy petition therefore automatically results in a transfer of all of the debtor's assets to the bankruptcy estate. *See, e.g., Baker Huges Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.),* 416 F.3d 394, 400 (5th Cir. 2005) (noting that bankruptcy filing creates an estate and an "accompanying transfer of the property of the debtor . . . to the estate"); *McKown v. United States Dep't of Agric.,* 276 F. Supp. 2d 1201, 1209 (D.N.M. 2003) ("When Appellants filed their bankruptcy petitions, all of their legal and equitable interests transferred to their bankruptcy estates.").

No. 05-2783, 2006 WL 285974, at *4 (E.D. La. Feb. 6, 2006). *See also* Tr. 51–52.

Thus, because the Operating Agreement specifically addressed the transfer of the company's assets, the default provision of La. R.S. § 12:1318(B)(2) was inapplicable. (Tr. 54.) And because a unanimous consent of the parties was required to transfer all of the company's assts, a unanimous consent was required to place the company in bankruptcy. (Tr. 54–55.) Accordingly, because Belton did not have the unanimous consent of all of APG's members, he had no authority to file the bankruptcy petition, and it had to be dismissed. (*Id.*)

The bankruptcy court next turned to La. R.S. § 12:1335, which provided for the dissolution of companies. The court found that, while that remedy is available, it is not through the bankruptcy court because "[b]ankrupcy courts do not decree an LLC dissolved." (Tr. 55.)

### C. Proceedings before this Court

On May 15, 2023, ARG appealed. (Doc. 1.) The record and transcript of the hearing have been filed into the record, (Docs. 2-1, 4), and the matter is fully briefed, (Docs. 5–7.)

## II. LEGAL STANDARD

### A. Standard of Review

"Bankruptcy court rulings and decisions are reviewed by a court of appeals under the same standards employed by the district court hearing the appeal from bankruptcy court; conclusions of law are reviewed *de novo*, findings of fact are reviewed for clear error, and mixed questions of fact and law are reviewed *de novo*." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000) (citing *Traina v. Whitney National Bank*, 109 F.3d 244, 246 (5th Cir. 1997)).

"A finding of fact is clearly erroneous only if 'on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed.' " *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003) (quoting *Hibernia Nat'l Bank v. Perez (In re Perez)*, 954 F.2d 1026, 1027 (5th

8

Cir. 1992)). The reviewing court "must give 'due regard . . . to the opportunity of the [bankruptcy] court to judge the credibility of the witnesses.' " *Id.* (quoting Perez, 954 F.2d at 1027).

### B. Applicable State Law

"To determine whether a voluntary bankruptcy petition filed on behalf of a business entity was filed with the proper authority, the Court looks to the law of the entity's state of organization." *Delta Starr*, 2006 WL 285974, at *2 (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945); *Berger v. Newhouse (In re Pirhana, Inc.)*, 83 F. App'x 19, 21 (5th Cir.2003)).

"An operating agreement is contractual in nature; thus, it binds the members of the LLC as written and is interpreted pursuant to contract law." *Kinkle v. R.D.C., L.L.C*, 04–1092 (La. App. 3 Cir. 12/8/04), 889 So.2d 405, 409 (citing *Hebert v. Ins. Ctr., Inc.*, 97-298 (La. App. 3 Cir. 1/7/98), 706 So. 2d 1007; La. Civ. Code art. 1983); *see also* 9 Susan Kalinka, Jeffrey W. Koonce, & Philip T. Hackney, La. Civ. L. Treatise, LLC & Partnership Bus. & Tax Plan § 1:5 (4th ed. 2023) (same). The Louisiana Supreme Court has provided the following general principles for interpreting contracts:

> Contracts have the effect of law for the parties and the [i]nterpretation of a contract is the determination of the common intent of the parties. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties. However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Most importantly, a contract must be interpreted in a common-sense fashion, according to the words of the contract their

> common and usual significance. Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

*Deep S. Commc'ns, LLC v. Fellegy*, 652 F. Supp. 3d 636, 665 (M.D. La. 2023) (deGravelles, J.) (quoting *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 2012-2055 (La. 3/19/13), 112 So. 3d 187, 192 (quotation marks and citations omitted)).

### III. DISCUSSION

APG raises three issues on appeal: (1) that the bankruptcy court erred in finding that a majority member needed the unanimous consent of APG's members before filing a bankruptcy petition; (2) that the court erred in ruling that the filing of a Chapter 7 bankruptcy petition constituted a sale of the debtor's assets under the Operating Agreement; and (3) that the court erred in refusing to decide whether to dissolve the business under La. R.S. § 12:1335. (Doc. 5.) For the following reasons, this Court rejects each of these arguments.

#### A. Unanimous Consent

On the first issue, APG contends that the bankruptcy court incorrectly relied on Section 5.1.3, which places limits on the authority of the manager to dispose of all company money. (Doc. 5 at 12.) APG maintains this was in error (1) because, contrary to Section 5.1.3(ix), Brockman did not have the unanimous consent of the members to file his motion to dismiss; and (b) because a majority member can file a bankruptcy petition under Section 5.2.4, which again provides:

> 5.2.4. Except as otherwise provided in this Agreement, wherever the LLC Law requires unanimous consent to approve or take any action, that consent shall mean, in all cases, rather than the consent of all Members, the consent of Members holding fifty-one percent (51 %) or more of the Percentages then held by Members.

(*Id.* at 12–15 (quoting R.058).)

10

Brockman responds that Belton is unable to act on APG's behalf in any capacity after he was removed as President and the state law courts confirmed that. (Doc. 6 at 5–6.) Brockman reiterates that § 1318 specifically provides that the operating agreement can trump the default rules of Louisiana law, and that is precisely what happened in Section 5.1.3 of the Operating Agreement. (*Id.* at 7.) Brockman likewise relies on the broad grant of authority given in Section 3.1.2 of the First Amendment to the Articles of Organization and to the narrow exceptions on the manager's authority, none of which prohibit managers from placing APG in bankruptcy. (*Id.* at 8.) Appellee closes by saying that, if the unanimous vote of the members is needed to place the company in bankruptcy, then certainly a majority member cannot do so on its own. (*Id.*)

Belton replies by maintaining that the Articles of Organization and Operating Agreement are silent on the issue, so the majority member can do so. (Doc. 7 at 2.) Belton says that the ambiguity in those documents should not be construed against Belton. (*Id.*)

Having carefully considered the matter, the Court finds no error in the bankruptcy court's order. As to Belton's first argument, Brockman did not need unanimous consent under Section 5.2.4 to file the motion to dismiss. That section requires unanimous consent for: "(ix) any expenditure, acquisition, purchase, sale, exchange, financing, contract, or any other type of transaction exceeding $3,000." (R.057.) But Brockman's filing the motion to dismiss is not a "transaction" of any kind; it is an action by APG's manager to invalidate an *ultra vires* act by one of the company's members. As a result, APG is not entitled to relief on this ground.

Nor is APG entitled to relief under Section 5.2.4. The provision—which allows a majority member to act when the law requires unanimous consent—specifically provides that that general rule applies "[e]xcept as otherwise provided in this [Operating] Agreement." (R.058.)

Here, the Operating Agreement does so provide. Specifically, Section 5.1.3 states:

11

> 5.1.3 *Limitations on Authority of the Manager*. No act may be taken, sum expended, decision made or obligation incurred by the Company with respect to the following matters unless and until the same has been approved by a unanimous vote of the Members in accordance with their Interest: . . . (iii) sale, exchange, financing, refinancing or mortgaging of the assets of the Company (other than credit extended to the Company by usual creditors in the ordinary course of Company business);

(R.056–57.) Thus, the bankruptcy judge correctly determined that this provision limits Belton's authority to file the bankruptcy petition without unanimous consent.

APG argues that Section 5.1.3(iii) is limited to managers, but this contention is misplaced for a couple of reasons. First, Section 9.6 of the Operating Agreement specifically provides that "[t]he headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this agreement or the intent of the provisions hereof." (R.066.) Consequently, Section 5.1.3's title does not trump the provision's clear an unambiguous language—that "[n]o act may be taken . . . with respect to the following matters unless and until the same has been approved by a unanimous vote of the Members . . . ." (R.056.)

Second, Belton's interpretation would lead to absurd results. As Brockman argued on appeal and below, the President is given broad powers by the First Amended Articles of Organization (specifically, Section 3.1.2 (R.076–77))[1] and the Operating Agreement (specifically, Section 5.1.2, R.056).[2] Moreover, the Operating Agreement expressly limits the authority of

---

[1] Again, this Section provides, ""The President shall have full, exclusive, and complete discretion, power, and authority . . . to manage control, administer, and operate the business and affairs or the Company for the purposes herein stated, and to make all decisions affecting such business and affairs." (R.076–77.)

[2] Again, this provision states:

> The Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company, for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to: [certain enumerated powers]. . . .

12

members to act on APG's behalf (*see* Sections 5.1.3.1 & 5.1.3.2, R.057).[3] It is fundamentally unreasonable to conclude, as Belton advances, that the governing documents would give the manager broad powers except in narrow, important areas that require the unanimous consent of members, *but then at the same time* give a single member, whose power is already severely curtailed, sole power over those critical issues. Again, "courts should refrain from construing the contract in such a manner as to lead to absurd consequences" and instead interpret them in "a common-sense fashion . . . so that each [provision] is given the meaning suggested by the contract as a whole," *Fellegy*, 652 F. Supp. 3d at 665. Consequently, the court must reject APG's position in favor of the bankruptcy judge's.

Finally, APG also claims in the alternative that there was no meeting of the minds, so the operating agreement is null and void under Louisiana law. But, "[a] party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal. . ." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (citing *United States v. Zuniga*, 860 F.3d 276, 284 n.9 (5th Cir. 2017) ("Failure to raise a claim to the district court 'constitutes a forfeiture, not a waiver, of that right for the purposes of appeal.' "). Exceptions exist for jurisdictional questions and where the issue "is a purely legal matter and failure to consider [it] will result in a miscarriage of justice. " *Id.* at 398 (quoting *Essinger v. Liberty Mut. Fire Ins. Co.*,

---

[3] Those sections provide:

> 5.1.3.1. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

> 5.1.3.2. This Section 5.1 supersedes any authority granted to the Members pursuant to Section 1318(B) of the LLC law. Any member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expenses incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

(R.056.)

534 F.3d 450, 453 (5th Cir. 2008)). "[A]ppellate courts have considerable discretion in deciding whether to consider an issue that was not raised below." *Id.*

Here, the Court exercises its discretion not to address the meeting of the minds issue. This issue does not appear to satisfy any of the exceptions mentioned in *Rollins*. Moreover, there is no reason why this argument could not have been made in the bankruptcy court. Thus, this Court deems it forfeited.

However, even if the Court were to consider this argument on the merits, it would reject it. The Court finds that this position is a repackaged version of APG's third assignment of error (i.e., that the bankruptcy court should have dissolved the company). For the reasons given below, the Court rejects it.

### B. Sale and Dissolution

The second and third issues are easily dispensed with. On the second, APG contends that, under Louisiana law, a sale is a "contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale." (Doc. 6 at 18 (quoting La. Civ. Code art. 2439).) Here, argues APG, there is no price under 11 U.S.C. § 541(a), so the bankruptcy judge erred in finding that the filing of the petition constituted a sale of APG's assets to the estate.

But the false premise in APG's argument is that the Operating Agreement refers to a sale exclusively. To the contrary, Section 5.1.3 requires a "unanimous vote of the Members" for a "sale, exchange, financing, refinancing, or mortgaging of the assets of the Company. . . ." (R.056.) Reading this list as a whole, the only logical meaning of this clear and unambiguous language is that it refers to the "transfer" of all of the assets of the company—precisely what happens when a bankruptcy petition is filed under § 541(a) and *Delta Starr*, 2006 WL 285974, at *4 (citations

14

omitted). Indeed, it would be an absurd result to conclude that the Operating Agreement governed transferring all of the assets for a price in a sale, *see* La. Civ. Code art. 2439; for a "thing other than money" in an exchange, *see id.* art. 2660; or potentially with a security device, *see id.* art. 3278 (defining mortgage), *but not* also for purposes of a bankruptcy. *See Fellegy*, 652 F. Supp. 3d at 665 (stating that "courts should refrain from construing the contract in such a manner as to lead to absurd consequences" and that they should do so in "common-sense fashion"). Thus, this Court agrees with the bankruptcy judge's interpretation of the Operating Agreement and Bankruptcy Code and rejects APG's second assignment of error.

APG's third assignment is meritless as well. Again, APG contends that the bankruptcy court erred in not dissolving the LLC under La. R.S. § 12:1335, but this Court agrees that this is not the province of a bankruptcy court. *See N.L.R.B. v. Better Bldg. Supply Corp.*, 837 F.2d 377, 379 (9th Cir. 1988) ("Chapter 7 proceedings cannot dissolve a corporation. If the Mylans sought to dissolve their corporations, they should have used state procedures." (citing *Collier on Bankruptcy* at 727-8 (15th ed. 1979) ("[T]he Code does not provide for dissolution of corporations.")); *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 103 F. Supp. 2d 1180, 1183–84 (N.D. Cal. 2000) ("any dissolution of a corporation must be effectuated under state law, since the Bankruptcy Code does not provide for the dissolution of corporations. . . . [A] liquidation alone does not dissolve a corporation." (citing *Better Bldg*, 837 F.2d at 379; 6 *Collier on Bankruptcy* ¶ 727.01[3] (King ed., 15th ed. rev.1998)); 6 Collier on Bankruptcy ¶ 727.01[3] (Richard Levin & Henry J. Sommer eds., 16th ed. 2023) (same). Accordingly, the Court rejects APG's third assignment of error.

## IV. CONCLUSION

For the reasons stated above, the Court AFFIRMS the May 3, 2023, order of the bankruptcy court dismissing this case.

Signed in Baton Rouge, Louisiana, on <u>February 6, 2024</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**